Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Jennifer Abreu, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,                                       Docket No.: _____(     )

                          Plaintiffs,

            -against-


SATYA DRUG CORP. D/B/A FARMACIA CENTRAL,
RKD RX CORP., MICHAEL BASSANELL, AND
JOHN DOE NOS. "1" THROUGH "5,"

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Satya Drug Corp. d/b/a Farmacia

Central ("Satya Drug"), RKD Rx Corp. ("RKD Rx"), Michael Bassanell ("Bassanell"), and John

Doe Nos. "1" through "5" (collectively, the "Defendants"), hereby allege as follows:

## **NATURE OF THE ACTION**

1.     This action seeks to terminate an on-going fraudulent scheme perpetrated by the Defendants who exploited the New York "No-Fault" insurance system by submitting more than $3.5 million in fraudulent billing to GEICO for pharmaceuticals dispensed to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds").  Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent claims with exorbitant charges for a set of specifically targeted, medically unnecessary "pain relieving" topical prescription drug products, including topical compounded pain creams, topical pain gels, lotions and ointment, and topical pain patches, primarily in the form of Diclofenac Gel 3%, Lidocaine 5% Ointment, Terocin 4% Patches, and Lidocaine 5% Patches (collectively, the "Fraudulent Topical Pain Products"), as well as oral medications, primarily in the form of oral pain relievers and muscle relaxants (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.     In order to exploit the Insureds for financial gain, Bassanell and the other Defendants targeted the prescription and dispensing of the Fraudulent Topical Pain Products, in place of other effective, but much-less costly prescription and non-prescription drug products because the Defendants were able to acquire – or with respect to the compounded pain creams, manufacture – the Fraudulent Topical Pain Products at low cost and then dispense and bill for them at egregious prices.  The Defendants presented Satya Drug and RKD Rx (the "Pharmacies") as separately owned, neighborhood pharmacies, when in fact, the Pharmacies were used as part of an integrated scheme to dispense millions in billing to GEICO for the Fraudulent Pharmaceuticals.

3.     As part of the scheme, Bassanell and the other Defendants entered into illegal, collusive agreements with prescribing healthcare providers (collectively, the "Prescribing Providers") and unlicensed laypersons (collectively, the "Clinic Controllers") who work at or are

associated with various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these illegal, collusive agreements, the Defendants steered the Prescribing Providers and Clinic Controllers to prescribe and direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products to the Pharmacies, in place of other effective, but much less costly prescription and non-prescription drug products.

4.      The Defendants, in exchange for paying kickbacks or providing other financial incentives, received numerous medically unnecessary, duplicitous prescriptions from the Prescribing Providers and Clinic Controllers pursuant to predetermined protocols. These prescriptions were frequently generated using preset labels and stamps created by the Defendants and distributed to the Prescribing Providers and Clinic Controllers, in violation of law.

5.      The Defendants' scheme initially centered around Satya Drug's production and dispensing of large volumes of topical compounded pain creams in set formulations (the "Fraudulent Compounded Pain Creams"), which were not approved by the United States Food and Drug Administration ("FDA"), and which were dispensed without complying with state and federal licensing requirements. The Defendants' billing through Satya Drug for the Fraudulent Compounded Pain Creams typically ranged from $1,116.97 to $1,790.52 for a single tube, with charges at times exceeding $1,900.00.

6.      Thereafter, the Defendants primarily billed for specifically targeted Fraudulent Topical Pain Products in the form of Diclofenac Gel 3%, Lidocaine 5% Ointment, and various topical pain patches, including Terocin 4% Patches and Lidocaine 5% Patches. The Defendants intentionally dispensed these targeted Fraudulent Topical Pain Products in order to financially enrich themselves through egregiously inflated charges submitted to GEICO.

7.      For example, billing from Satya Drug typically ranged from $1,179.46 to $2,364.00 for a single tube of Diclofenac Gel 3%; from $747.90 to $1,931.36 for a single tube of Lidocaine 5% Ointment, with charges at times exceeding $2,000.00; from $1,282.00 to $2,560.50 for a prescription of Terocin 4% Patches; and from $295.81 to $929.84 for a prescription of Lidocaine 5% Patch, with charges at times exceeding $1,100.00. Likewise, RKD Rx typically billed $1,184.50 for a single tube of Diclofenac Gel 3%; and from $285.80 to $621.56 for a prescription of Lidocaine 5% Patch, with charges at times exceeding $1,100.00.

8.      The Defendants' scheme not only inflated the charges submitted to GEICO and other insurers but also posed serious risks to the patients' health as the Fraudulent Pharmaceuticals were prescribed and dispensed in predetermined fashion, without regard to genuine patient care, and without regard to proper documentation.

9.      By this action, GEICO seeks to recover more than $627,200.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to the Pharmacies of over $1,416,800.00 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through the Pharmacies because:

(i)      The Pharmacies billed for pharmaceutical products that were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)      the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives;

(iii)      the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals in order to inflate the charges to GEICO;

(iv)     the Defendants engaged in illegal bulk compounding by having Satya Drug specialize in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits; and

(v)     the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, and duplicitous prescriptions.

10.     The Defendants fall into the following categories:

(i)     The Pharmacies, Satya Drug and RKD Rx, are New York corporations engaged in a fraudulent scheme in which they dispensed the Fraudulent Pharmaceuticals in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault Benefits to which it is not entitled;

(ii)     Bassanell is the purported owner of Satya Drug and RKD Rx; and

(iii)     John Doe Nos. "1" through "5" are persons and entities, presently not identifiable, who along, with the Defendants, participated in the operation and control of the Pharmacies, including facilitating the illegal, collusive agreements with the Prescribing Providers and Clinic Controllers.

11.     The Defendants' scheme began in 2015. As discussed more fully below, the Defendants at all times have known that: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive agreements in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; (iv) the Defendants engaged in illegal bulk compounding

by having Satya Drug specialize in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits; and (v) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, and duplicitous prescriptions.

12.     Based on the foregoing, the Pharmacies do not now have – and have never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds. The charts attached hereto as Exhibits "1" – "2" set forth a sample of the fraudulent claims that have been identified to date which the Defendants submitted, or caused to be submitted, to GEICO through Satya Drug and RKD Rx using the United States mails. As a result of the Defendants' scheme, GEICO has incurred damages of approximately $627,200.00.

## THE PARTIES

### I.    Plaintiffs

13.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

14.     Defendant Satya Drug is a New York corporation, incorporated on or about February 7, 2014, with its principal place of business at 113-07 Queens Blvd., Forest Hills, New York.

15.     Defendant RKD Rx is a New York corporation, incorporated on or about January 20, 2017, with its principal place of business at 39-11 104 Street, Corona, New York.

16.     Defendant Bassanell resides in and is a citizen of New York and is the purported owner of the Pharmacies.

17.     The Pharmacies and its owner Bassanell knowingly submitted fraudulent claims to GEICO for pharmaceuticals purportedly dispensed to GEICO Insureds and continue to seek reimbursement on unpaid fraudulent claims.

18.     John Doe Nos. 1-5 reside in and are citizens of New York.  John Doe Nos. 1-5 are individuals and entities, presently not identifiable, who, along with the Defendants, participate in the operation and control of the Pharmacies, including facilitating illegal, collusive agreements with the Prescribing Providers and Clinic Controllers.

### III.   Relevant Non-Parties

19.     MSB Rx Corp. d/b/a Forest Drugs ("MSB Rx") is a New York corporation, incorporated on or about November 6, 2008, with its principal place of business at 112-53 Queens Boulevard, Forest Hills, New York.

20.     Taira Rx Corp. d/b/a Forest Drugs ("Taira Rx") is a New York corporation, incorporated on or about May 12, 2015, with its principal place of business at 112-53 Queens Boulevard, Forest Hills, New York.

21.     KZ Pharmacy, Inc. ("KZ Pharmacy") is a New York corporation, incorporated on or about January 26, 2018, with its principal place of business at 112-53 Queens Boulevard, Forest Hills, New York.

22.     Bassanell was previously involved in a No-Fault insurance fraud scheme, in which he used a series of three pharmacies – MSB Rx, Taira Rx and KZ Pharmacy (collectively, the

"Non-Party Pharmacies") – to submit fraudulent No-Fault charges for fraudulent topical pain products, as well as other pharmaceuticals pursuant to collusive arrangements with various prescribing doctors, including defendants Mani Ushyarov, D.O. and Jordan Sudberg, M.D. See Government Employees Insurance Co., et al. v. MSB Rx Corp. d/b/a Forest Drugs, et al., E.D.N.Y. Case No. 19:cv-00232.

23.     Pursuant to the fraudulent scheme, Bassanell created the Non-Party Pharmacies, owned on paper by three separate individuals, but in actuality owned and controlled by Bassanell at the same location, 112-53 Queens Boulevard, Forest Hills, New York. Id. Thereafter, Bassanell entered sham sales agreements with other named defendants to conceal the true ownership and volume of fraudulent billing that Bassanell submitted through the Non-Party Pharmacies to GEICO and to obstruct any legitimate investigation into their fraudulent billing practices and illegal collusive agreements with prescribing doctors. Id.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

25.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

26.      In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

27.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this

is the District where a substantial amount of the activities framing the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of New York's No-Fault Laws

28.      GEICO underwrites automobile insurance in the State of New York.

29.      New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

30.      No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

31.      The No-Fault Laws limit reimbursement for benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

32.      An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative,

healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

33.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

34.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local dispensing requirement necessary to perform such service in New York … (emphasis supplied).

35.     <u>In State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313 (2005), the New York Court of Appeals made clear that healthcare providers who fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

36.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     An Overview of Applicable Licensing Requirements

37.     Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons

for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

38. Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

39. Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

40. Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

41. New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of code or specially marked prescriptions, while New York Education Law § 6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of secret formula ("coded") prescriptions.

42. New York Education Law § 6810 prohibits pharmacies from dispensing pharmaceuticals when a prescription form for a drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

43.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

44.     Pursuant to New York Education Law § 6512, §6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

45.     New York Education Law § 6530(17) prohibits a licensed physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

46.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

47.     New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

48.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

## III.     An Overview of Compounded Drug Products

49.     The United States Federal Food, Drugs, and Cosmetic Act ("FDCA") authorizes the FDA to oversee the safety of food, drugs, and cosmetics.

50.     The FDA strictly regulates OTC and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

51.     FDA-approved drugs require: (i) approval prior to marketing; (ii) compliance with federal labelling laws; and (ii) that the drugs be made and tested in accordance with good manufacturing practice regulations (GMPs), which are federal statutes that govern the production and testing of pharmaceutical products.

52.     Compounded drugs are not FDA-approved, though they may contain FDA-approved drugs, and are generally exempt from the FDA approval process which applies to new drugs – but only under limited circumstances. See 21 U.S.C. § 353a.

53.     In particular, pursuant to Section 503A of the FDCA, as amended by the Compounding Quality Act, the laws applicable to drugs regulated by the FDA, including the laws relating to the safe manufacturing of drugs, generally do not apply to a "compounded" drug product: (1) if the drug product is compounded for an identified individual patient based on the receipt of a valid prescription order that a compounded product is necessary for the identified patient, and (2) if the compounding is performed by a licensed pharmacist in a state licensed pharmacy.

54.     Unlike the FDA-approved products, consumer and prescribers cannot assume that compounded drugs were made by validated processes in properly calibrated and cleaned equipment; that the ingredients in the drug were obtained from FDA-approved sources; that production personnel had the requisite knowledge and training; and that appropriate laboratory testing was performed to verify the compounded drug's potency, purity, and quality.

55.     The FDA has publicly expressed concern regarding large-scale drug manufacturing under the guise of traditional small-scale pharmacy compounding.  For example, the FDA has noted that poor practices on the part of bulk drug compounders can result in contamination or products that do not possess the strength, quality, and purity required. Published reports also consistently show that compounded drugs fail to meet specifications at a considerably higher rate than FDA-approved drugs.

56.     Traditional pharmacy compounding by state licensed pharmacies, therefore, is permissible when done on a small scale by pharmacists who prepare the medication based on an individual prescription. Specifically, when compounded drugs meet the requirements of 21 U.S.C. § 353a and are compounded to meet the particular needs of an individual patient, they can be exempted from the requirement, among others, that they be FDA-approved. See 21 U.S.C. § 355(a).

57.     When Congress adopted 21 U.S.C. § 353a, its express intent was to "ensure continued availability of compounded drug products as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing [of drugs that would otherwise require FDA approval] under the guise of compounding." H.R. Rep. No. 105-399, at 94 (1997) (Conf. Rep.) (emphasis added).  As Congress stated at the time:

> "The exemptions in [this section] are limited to compounding for an *individual patient based on the medical need of such patient for the particular drug compound*. To qualify for the exemptions, the pharmacist or physician must be able to cite to a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate. Although recording the medical need directly on each prescription order would not be required, this technique would be one of many acceptable ways of documenting the medical need for each compounded drug product. This medical need would not include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons. The pharmacist may rely on appropriately documented input from the physician as to whether a commercially available drug product is not appropriate for the identified individual patient."

S. Rep. No. 105-43, at 67-68 (1997) (emphasis added).

58.     The prescription of compounded drug products and ensuing billing to both private and public insurers has been the subject of state and federal investigations, litigation, and reports due to increased concerns regarding fraud.

59.     The U.S. Department of Health & Human Services and the U.S. Postal Service have both issued reports documenting fraud concerns with compounded drugs.  See High Part D Spending on Opioids and Substantial Growth in Compound Drugs Raise Concerns, HHS OIG Data Brief, OEI-16-00290 (June 2016); Worker's Compensation Compound Drug Costs, Management Advisory, Report No. HR-MA-16-003 (March 14, 2016).  Most recently, the U.S. Department of Health issued a report which noted that many pharmacies in New York State are among the most questionable in the nation.  See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018). This report noted that the pharmacies with questionable billing primarily billed for compounded topical drugs containing lidocaine and diclofenac, and that the "OIG has previously raised concern about potential fraud and abuse related to both diclofenac and lidocaine."

60.     Further, there have been numerous criminal proceedings commenced in connection with compounded drug products.  For example:

- in January 2014, the United States Attorney for the District of New Jersey obtained a guilty plea from a pharmacist involved in the payment of kickbacks to a physician in exchange for prescriptions for compounded pain creams.  See USA v. Kleyman, 1:14-CR-598-JHR, Docket No. 1;

- in February 2016, the United States Attorney for the Northern District of Texas indicted two laypersons who conspired with physicians and pharmacies in a scheme involving producing, prescribing, and distributing compounded creams, including payment of kickbacks to prescribing physicians and insured beneficiaries. See USA v. Cesario, 3:16-CR-060-M, Docket Nos. 3, 75;

- in June 2016, the United States Attorney for the Middle District of Florida indicted a physician for a fraudulent scheme involving payment of kickbacks for the referral of patients and prescriptions for compounded creams. See USA v. Baldizzi, 8:16-CR-271-MSS-AEP, Docket No. 1;

- in August 2016, the United States Attorney for the Southern District of New York indicted members of the Genovese, Gambino, Luchese, and Bonanno crime families, whose alleged illegal activities included "causing…corrupt doctors to issue unnecessary and excessive prescriptions for expensive compound creams" billed to insurers.  See USA v. Parrello, 16 Crim. 522 (2016); and

- in 2020, the United States Attorney for the Central District of California indicted three laypersons and one physician for their involvement in a $22 million fraudulent scheme in which they paid kickbacks in exchange for large volumes of fraudulently generated prescriptions for compounded pain creams. See USA v. Bell, 8:20-CR-00018-JVS, Docket No. 1.

## IV.    The Defendants' Scheme Involving the Fraudulent Pharmaceuticals

### A.   Overview of the Scheme

61.     Beginning in 2015, Bassanell masterminded and implemented a pharmacy fraudulent scheme in which he used Satya Drug to exploit patients for financial gain by billing the New York automobile industry for millions of dollars in inflated charges – which they were not eligible to receive – for the Fraudulent Pharmaceuticals, including the Fraudulent Compounded Pain Creams and the Fraudulent Topical Pain Products purportedly dispensed to Insureds.

62.     Bassanell operated Satya Drug at 113-07 Queens Boulevard, Forest Hills, New York, while continuing to own and operate the Non-Party Pharmacies located just four doors down from Satya Drug.

63.     In January of 2018, Bassanell began to simultaneously operate and also submit billing through RKD Rx, another pharmacy located at 39-11 104 Street, Corona, New York, less than five miles from Satya Drug and the Non-Party Pharmacies. The Defendants submitted billing through RKD Rx for about one year.

64.     Satya Drug and RKD Rx are no longer actively operating or dispensing pharmaceuticals, but both pharmacies continue their fraudulent scheme by hiring law firms to pursue collection on the voluminous billing submitted to GEICO.

65.     Bassanell presented the two pharmacies, Satya Drug and RKD Rx as separate, storefront neighborhood pharmacies operating in Queens, when in fact, they operated as a single large-scale fraudulent scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally disregarding a vast array of other pharmaceutical products, including OTC medications readily available at a fraction of the cost.

66.     Satya Drug and RKD Rx have common ownership, each used the same law firm to submit its billing to GEICO, each used similar billing forms, and each billed for substantially the same pharmaceuticals.

67.     Unlike legitimate pharmacies dispensing a variety of pharmaceutical products, the Pharmacies intentionally focused on and targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

68.     Satya Drug and RKD Rx operated, and continue to operate, as part of the same fraudulent scheme, notwithstanding the submission of fraudulent billing under two different names and two different identification numbers, and the filing of numerous separate collection proceedings to collect the fraudulent billing on behalf of these two ostensibly separate pharmacies.

69.     From February 2015 through October 2016, the Defendants' scheme primarily centered around Satya Drug's mass production and dispensing of the Fraudulent Compounded Pain Creams, billing at least $980,000.00 for these compounded drug products.

70.     Satya Drug submitted voluminous billing for the Fraudulent Compounded Pain Creams, which were not approved by the FDA, without tailoring the medications to the individual needs of an individual patient, and without complying with requirements designed to ensure the quality, safety, and effectiveness of mass-produced drug products.

71.     Satya Drug, in fact, produced the Fraudulent Compounded Pain Creams in bulk by assembling combinations of multiple drug ingredients with unproven effects in order to create exorbitantly priced products to financially enrich themselves rather than to treat or otherwise benefit the Insureds who purportedly received them.

72.     The more ingredients the Defendants included in a Fraudulent Compounded Pain Cream, the more they could inflate the charges they could submit to GEICO and other insurers as compounded drug products are billed per ingredient.

73.     The scheme by the Defendants to routinely manufacture and dispense large volumes of the Fraudulent Compounded Pain Creams pursuant to their collusive arrangements with the Prescribing Providers and Clinic Controllers egregiously inflated the charges submitted to GEICO.  For example, billing from the Defendants typically ranged from $1,116.97 to $1,790.52 for a single tube of a Fraudulent Compounded Pain Cream, with charges at times exceeding $1,900.00.

74.     In October of 2016, the Defendants ceased manufacturing, dispensing, and billing for the Fraudulent Compounded Pain Creams through Satya Drug – likely due to increased scrutiny and litigation against pharmacies by federally funded healthcare programs (i.e., Medicaid and Medicare) and private insurers seeking to combat private insurance fraud based on the fraudulent prescription, dispensing, and billing practices associated with compounded drugs.

75.     Contemporaneously with the Defendants' cessation of the fraudulent compounding operation, they drastically increased the billing they submitted through Satya Drug – and thereafter, also through RKD Rx – for other specifically targeted Fraudulent Topical Pain Products, primarily in the form of Diclofenac Gel 3%, Lidocaine 5% Ointment, Terocin 4% Patches, and Lidocaine 5% Patches.

76.     The Defendants submitted over $3.5 million in fraudulent billing to GEICO under the names of Satya Drug and RKD Rx.

77.     Further, the Defendants have submitted – to GEICO alone – over $3 million in claims for reimbursement of the Fraudulent Topical Pain Products, which accounts for approximately 85% of the billing submitted through Satya Drug and RKD Rx.

78.     Specifically, Satya Drug submitted to GEICO approximately $2.8 million dollars in claims for reimbursement, of which at least $2.4 million was for the Fraudulent Topical Pain Products. Likewise, RKD Rx submitted to GEICO approximately $715,344.50 in claims for reimbursement, of which at least $618,681.62 was for the Fraudulent Topical Pain Products.

79.     In keeping with the fact that the Defendants targeted a specific and limited set of pharmaceuticals that enabled them to maximize their inflated charges to GEICO, as stated above, the Defendants, through Satya Drug and RKD Rx, overwhelmingly dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Ointment, Terocin 4% Patches, and Lidocaine 5% Patches.

80.     The Defendants chose these topical pain products – Diclofenac Gel 3%, Lidocaine 5% Ointment, Terocin 4% Patches, and Lidocaine 5% Patches – because they could acquire them at low cost and submit claims for reimbursement to GEICO at exorbitant prices after illegally steering prescriptions to themselves. Moreover, the Defendants knew that similar OTC drug

products that could be recommended to Insureds were not covered expenses under the No-Fault Laws.

81.     The remaining billing submitted through the Pharmacies was primarily for oral pain-relieving medication, including nonsteroidal anti-inflammatory drugs ("NSAIDs") and muscle relaxers submitted as part of the scheme to defraud GEICO.

82.     In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and Clinic Controllers in which the Defendants steered them to prescribe and direct large volumes of prescriptions to Satya Drug and RKD Rx for the targeted set of Fraudulent Topical Pain Products, including the Fraudulent Compounded Pain Creams which were purportedly prescribed and dispensed to treat patients at the No-Fault Clinics.

83.     The Defendants ensured that the Prescribing Providers and Clinic Controllers directed the prescriptions for the Fraudulent Pharmaceuticals to Satya Drug and RKD Rx, regardless of (i) the distance of the pharmacy to the Insureds' residences and (ii) the fact that there were countless other pharmacies located much closer to the Insured's residences.

84.     In fact, approximately 53% of the Insureds that allegedly received pharmaceuticals dispensed by Satya Drug lived outside of Queens, New York, where the pharmacy is located, with a majority of the Insureds' residences scattered throughout Brooklyn, Bronx, Manhattan, Staten Island and Long Island, including Nassau and Suffolk County.

85.     Likewise, approximately 71% of the Insureds that allegedly received pharmaceuticals dispensed by RKD Rx lived outside of Queens, New York, where the pharmacy is located.

86.     In some instances, the Insureds' residences are located in cities and counties outside of New York City, including Albany, Westchester County, Rochester County, Dutchess County, Orange County, Broome County, and Rensselaer County, with some residences located more than 60 miles away from the Pharmacies, and outside of the State of New York.

87.     But for the Defendants' illegal, collusive agreements with the Prescribing Providers and Clinic Controllers, these Insureds would not have received pharmaceutical products from a pharmacy that is located in a county or city outside of their place of residence.

88.     Instead, the Prescribing Providers and the Clinic Controllers directed prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies, irrespective of their inconvenient locations to the Insureds' residences because the prescriptions were being issued pursuant to illegal, collusive agreements between the Defendants and the Prescribing Providers and Clinic Controllers.

89.     The Pharmacies, in exchange for the payment of kickbacks or other financial incentives, received medically unnecessary prescriptions from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols.

90.     The No-Fault Clinics present themselves as legitimate healthcare practices when, in fact, they are one-stop-shop medical mills designed to subject Insureds to as many healthcare goods and services as possible in order to submit volumes of fraudulent claims to No-Fault insurers such as GEICO without regard to genuine patient care.

91.     The Defendants used the prescriptions obtained from the No-Fault Clinics to bill GEICO and other insurers for the Fraudulent Pharmaceuticals.

92.     The prescriptions that the Pharmacies filled often contained preset labels or stamps with the names of some of the Fraudulent Pharmaceuticals, which the Defendants provided to the

Prescribing Providers and Clinic Controllers so as to make it as convenient as possible to prescribe, or cause to be prescribed the Fraudulent Pharmaceuticals and steer those prescriptions to the Defendants.

93.     A sample of the prescriptions issued by the Prescribing Providers using preset labels or rubber stamps, which the Defendants submitted to GEICO in support of its fraudulent billing, is annexed hereto as Exhibit "3".

94.     The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

95.     The Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try OTC products; and (iv) prescribed and dispensed without any attention to cost and fiscal responsibility, because, among other things, all pharmacists in New York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

96.     The Prescribing Providers and the Clinic Controllers would have not engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including using the preset labels or stamps, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacies, unless they profited from their participation in the

illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

### B.  The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care

97.    In basic terms, the goal of medical treatment is to help patients get better in a timely manner.  Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from the Pharmacies – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacks in individualized care and fails to utilize evidence-based medicine practices with the goal of the Insureds' timely return to good health.

98.    Despite the basic goal to help patients get better in a timely manner, the treatment reports almost uniformly reflect that the Insureds do not get better, do not return to good health, and/or do not experience improvement in their conditions such that the Insureds can terminate medical treatment expeditiously and return to normal activity.

99.    Rather, as part of the predetermined protocol, the Prescribing Providers produced generic, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the No-Fault Clinic providers purport to render to Insureds. These healthcare services include the prescription of excessive amounts of medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

100.    Notwithstanding the creation of the examination reports, the Prescribing Providers' prescription of the Fraudulent Pharmaceuticals dispensed by the Pharmacies was based on predetermined protocols designed to exploit the Insureds for financial gain, without regard to the genuine needs of the patients.

101.    To the extent any examination was actually performed at all, the Prescribing Providers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals that were dispensed by the Pharmacies.

102.    Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know whether the patient was taking any medication or suffering from any co-morbidity that would contraindicate the use of a particular prescribed drug product.

103.    The Prescribing Providers also failed to document in their examination reports whether the patients was intolerant of oral medications thereby necessitating a prescription for a Fraudulent Topical Pain Product.

104.    The Prescribing Providers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by the Pharmacies were actually used by the patient.

105.    The Prescribing Providers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals dispensed by the Pharmacies provided any relief to the patient or whether the patient experienced any side effects associated with the prescribed pharmaceutical product.

106.    At times, the Prescribing Providers failed to document in any of their examination reports that the patient was to receive a Fraudulent Pharmaceutical.

107.    At other times, the Defendants dispensed and billed for refills of Fraudulent Pharmaceuticals that were not authorized by the prescriptions purportedly issued by the Prescribing Providers.

108.    Notably, each year approximately 4.5 million ambulatory care visits and 100,000 deaths in the United States occur as a result of adverse drug reactions. A substantial number of these adverse drug reactions are the result of improper prescriptions, including improper prescription practices associated with therapeutic duplication. See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

109.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., Ibuprofen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

110.    In keeping with the fact that the Fraudulent Pharmaceuticals were prescribed and dispensed without regard to genuine patient care, the Prescribing Providers issued multiple prescriptions for multiple Fraudulent Pharmaceuticals, from the same therapeutic class, on the same date to a single patient. For example:

- Insured D.B. was allegedly involved in a motor vehicle accident on July 6, 2018. Thereafter, D.B. sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York.  On July 10, 2018, D.B. underwent an initial examination with Patricia Kelly, M.D. ("Dr. Kelly") who the *following* day issued prescriptions for Diclofenac Gel 3% and Naproxen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine (Flexeril). On July 16, 2018, Satya Drug dispensed and billed for Diclofenac Gel 3%, Naproxen, and Cyclobenzaprine pursuant to prescriptions issued by Dr. Kelly on July 11, 2018. On July 26, 2018, Satya Drug dispensed a refill of Diclofenac Gel 3%, and in support of the charge, submitted the **same exact prescription** issued by Dr. Kelly on July 11, 2018, despite the fact that the prescription does not authorize any refills of Diclofenac Gel 3%.

- Insured C.D. was allegedly involved in a motor vehicle accident on August 13, 2018. Thereafter, C.D. sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York. On August 21, 2018, C.D. underwent an initial examination with Dr. Kelly who the *following* day issued prescriptions for Diclofenac Gel 3% and Naproxen – two drug products from the same

therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine. On August 22, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3%, Naproxen, and Cyclobenzaprine pursuant to prescriptions issued by Dr. Kelly on August 22, 2018.

- Insured U.H. was allegedly involved in a motor vehicle accident on March 1, 2016. Thereafter, U.H. sought treatment with Starrett City Medical, P.C. at a No-Fault Clinic located at 105-10 Flatlands Avenue, Brooklyn, New York. On March 4, 2016, U.H. underwent an initial examination with Azu Ajudua, M.D. ("Dr. Ajudua"). On August 10, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% and Nabumetone – two drug products from the same therapeutic class – a topical and oral NSAID pursuant to prescriptions issued by Maria Del Carmen Rivera-Iturbe, M.D. ("Dr. Rivera-Iturbe") on August 10, 2018.  Notably, Dr. Rivera-Iturbe does not provide treatment through Starrett City Medical, P.C. where Insured U.H. was allegedly receiving treatment. Further, there is no corresponding examination report on or about August 10, 2018 by Dr. Rivera-Iturbe.

- Insured T.S. was allegedly involved in a motor vehicle accident on June 23, 2018. Thereafter, T.S. sought treatment with Smart Choice Medical, P.C. at a No-Fault Clinic located at 409 Rockaway Avenue, Brooklyn, New York. On July 11, 2018, T.S. underwent an initial examination with Yana Abayev, M.D. ("Dr. Abayev"). On August 29, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% and Meloxicam – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Lidocaine 5% Patch pursuant to prescriptions issued by Dr. Abayev on August 29, 2018.  Notably, there is no corresponding examination report on or about August 29, 2018 by Dr. Abayev.

- Insured F.F. was allegedly involved in a motor vehicle accident on July 20, 2018. Thereafter, F.F. sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 33-06 88th Street, Jackson Heights, New York.  On August 1, 2018, F.F. underwent an initial examination with Dr. Kelly. On August 3, 2018, Satya Drug dispensed and billed for Diclofenac Gel 3% and Naproxen – two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine pursuant to prescriptions issued by Dr. Kelly on August 2, 2018 – the day *after* the initial examination of the Insured.

111. Not only are these practices clearly part of a fraudulent scheme designed to maximize profit, but they also constitute therapeutic duplication and increase the risk of adverse drug reactions to the patients subject to them.

### C. **The Fraudulent Compounded Pain Cream Prescriptions**

112.    As part of their fraudulent, profit-driven scheme, the Defendants submitted or caused to be submitted, at least $980,000.00 in claims for medically unnecessary Fraudulent Compounded Pain Creams under the name of Satya Drug.

113.    The FDA defines traditional pharmacy compounding as the combining, mixing, or altering of ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription. Traditional pharmacy compounding plays a role in providing access to medications for patients with unique medical needs, which cannot otherwise be met with a commercially available product. State licensed pharmacies may compound specified medications when an FDA-approved drug product is not available or appropriate for a patient, including the strength or route of delivery.

114.    Compounded products are not FDA-approved, and therefore, not subject to FDA regulations regarding quality, safety, and effectiveness of manufactured drug products.

115.    Because compounded products are not FDA-approved, they should never be prescribed as a matter of routine therapy, and should only be prescribed to meet a legitimate specific need of an individual patient, or when all other forms of oral and/or topical medications approved for the treatment of pain have failed.

116.    Prior to receiving a prescription for any compounded drug product, a patient's medical records should document all other forms of FDA-approved drugs that were prescribed and failed to treat the symptom for which the compounded drug product was then prescribed, and/or

the medical rationale that supports the otherwise premature prescription of a compounded drug product.

117.    From February 2015 through October 2016, Satya Drug dispensed the Fraudulent Compounded Pain Creams, which were not FDA-approved, in predetermined set formulations, without tailoring the medications to the individual needs of an individual patient, and without complying with licensing requirements that are designed to ensure the quality, safety and effectiveness of bulk compounded drug products.

118.    Satya Drug, in order to generate profits, intentionally produced and dispensed the Fraudulent Compounded Pain Creams without regard for the absence of any proven topical efficacy of the combination of ingredients.

119.    The Defendants submitted exorbitant charges for the Fraudulent Compounded Pain Creams knowing that the topical efficacy of the products Satya Drug produced and dispensed was unproven, and that there was a wide range of commercially available, FDA-approved medications proven to have therapeutic effects available at a fraction of the cost.

120.    The Defendants knew that there was no legitimate medical need for the Fraudulent Compounded Pain Creams that could explain why a commercially available drug product alone would not be appropriate for the patients who were instead prescribed and dispensed the exorbitantly priced Fraudulent Compounded Pain Creams, often in addition to such commercially available products.

121.    The Defendants, solely to maximize profits, used Satya Drug to specialize in illegal compounding, producing large quantities of compounded drugs in set formulations, to compound and dispense specially marked, formulaic prescriptions.

122.    The Defendants then entered into collusive arrangements with the Prescribing Providers and Clinic Controllers in which they provided them with kickbacks or other financial incentives in exchange for fraudulent, illusory prescriptions for the Fraudulent Compounded Pain Creams.

123.    Notwithstanding the Defendants' attempt to conceal the scheme and present Satya Drug as a neighborhood pharmacy, the Defendants directly violated New York State and Federal regulatory and licensing requirements that govern large-scale drug compounders, drug manufacturers and outsourcing facilities and which prohibit collusive arrangements for compounding and/or dispensing of coded or specially marked prescriptions.

124.    The Fraudulent Compounded Pain Creams produced and dispensed by Satya Drug: (i) were not medically necessary; (ii) contained a combination of ingredients with no proven efficacy, or that produced no significant difference between the compounded drug and comparable commercially available products; (iii) were almost never prescribed properly under the governing regulations; and (iv) were prescribed and produced in large quantities without regard for medical necessity or the regulations governing the appropriate use of compounded drug products, as part of collusive arrangements with the Prescribing Providers and Clinic Controllers.

125.    In short, the Fraudulent Compounded Pain Creams produced by Satya Drug, and prescribed by the Prescribing Providers, served no purpose other than to exploit Insureds' No-Fault Benefits in order to financially benefit the Defendants.

**D.  Satya Drug Specialized in Large Scale Drug Compounded Activity in Violation of New York State Law and Federal Law Governing Drug Manufacturers and Outsourcing Facilities**

126.    As stated above, in order to facilitate the prescription of the Fraudulent Compounded Pain Creams, and to steer the Prescribing Providers and Clinic Controllers to direct

those prescriptions to Satya Drug, the Defendants often provided the Prescribing Providers and Clinic Controllers with preset labels or rubber stamps which contained the names of the Fraudulent Compounded Pain Creams and the designated formulations, including the names of the particular drug ingredients and percentage concentrations of each ingredient used. The Prescribing Providers then used these preset labels or stamps on their official New York State prescription pads to prescribe the Fraudulent Compounded Pain Creams to the Insureds.

127.    For example, as shown on the Defendants' billing submissions to GEICO, Satya Drug produced and dispensed, among others, the following predetermined, formulaic, coded Fraudulent Compounded Pain Creams:

- "**Compound D7**" containing the following ingredients:

    o   BACLOFEN (POW)

    o   CYCLOBENZAPRINE (POW)

    o   TETRACAINE (POW)

    o   DICLOFENAC (POW)

    o   GABAPENTIN

    o   VERSAPRO CREAM (BASE)

- "**Compound D5**" containing the following ingredients:

    o   KETOPROFEN (POW)

    o   CYCLOBENZAPRINE (POW)

    o   BACLOFEN (POW)

    o   LIDOCAINE (POW)

    o   VERSAPRO CREAM (BASE)

- "**Diclofenac Gel 3%/Lidocaine 5% Ointment**".

128.    The Defendants typically billed GEICO (i) between $1,579.66 and $1,790.52 for a single tube of Compound D7; (ii) between $1,116.97 and $1,269.24 for a single tube of Compound D5; and (iii) between $1,786.88 to $1,931.90 for a single tube of Diclofenac Gel 3% with Lidocaine 5% Ointment. In addition to dispensing and billing for "Diclofenac Sodium 3% Gel/ Lidocaine Ointment 5%" as a Fraudulent Compounded Pain Cream, the Defendants also dispensed and billed for Diclofenac Sodium 3% Gel and Lidocaine 5% Ointment as separate products.

129.    Despite the fact that, according to the FDA, traditional pharmacy compounding requires the combining, mixing, or altering of ingredients to create a customized medication for an individual patient in response to a licensed practitioner's prescription, the preset labels and stamps – created by the Defendants and distributed to the Prescribing Providers and Clinic Controllers – indicate that the Defendants created predetermined compounded drug products and produced them in bulk.

130.    Additionally, by including both Cyclobenzaprine and Baclofen– two different muscle relaxants – in every preformulated tube of Compound D7 and Compound D5, the Defendants engaged in therapeutic duplication whereby they unnecessarily increased the risk of adverse events to Insureds that purportedly received these Fraudulent Compounded Pain Creams.

131.    The Fraudulent Compounded Pain Creams were not created or prescribed by the Prescribing Providers to meet the unique needs of any individual patient.

132.    Rather, the Fraudulent Compounded Pain Creams were produced and dispensed by Satya Drug in large quantities without regard for the unique needs of any individual patient.

133.    By supplying the Prescribing Providers and Clinic Controllers with the preset labels and stamps, the Defendants steered the Prescribing Providers and Clinic Controllers to prescribe,

or cause to be prescribed, the Fraudulent Compounded Pain Creams in large volumes and direct those prescriptions to Satya Drug, in exchange for kickbacks or other financial incentives.

134.    The Defendants never cited a legitimate medical need for the Fraudulent Compounded Pain Creams that explained why a commercially available drug product was not appropriate to dispense to the Insureds who received the Fraudulent Compounded Pain Creams.

135.    Likewise, the Prescribing Providers never cited a legitimate medical need for the Fraudulent Compounded Pain Creams that explained why a commercially available drug product was not appropriate to prescribe to the Insureds who received the Fraudulent Compounded Pain Creams.

136.    For example, the Prescribing Providers never indicated that the patient had a contraindication to commercially available drug product or that the patient was failing to improve with the use of commercially available drug products, nor did they document any medication allergies or pre-existing comorbidity that may support the use of a Fraudulent Compounded Pain Cream.

137.    Accordingly, the Fraudulent Compounded Pain Creams, prescribed by the Prescribing Providers, and produced by the Defendants, were never customized for individual patients.  Rather, the same Fraudulent Compounded Pain Creams were repeatedly prescribed and dispensed to Insureds.

138.    Satya Drug, by specializing in creating and dispensing large volumes of the Fraudulent Compounded Pain Creams, engaged in bulk compounding activity (akin to that engaged in by drug manufacturers and outsourcing facilities) as opposed to compounding individual prescriptions on a case-by-case basis upon receipt of a valid prescription order.

139.    In the almost two years that Satya Drug illegally operated as a drug manufacturer of compounded pain creams, it billed GEICO alone at least $980,000.00 for the Fraudulent Compounded Pain Creams it created, produced, and dispensed pursuant to the duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers.

140.    GEICO makes up only a fraction of the New York automobile insurance market, and therefore, Satya Drug likely billed all New York automobile insurers more than three times the amount billed to GEICO.

141.    Accordingly, between February 2015 and October 2016, Satya Drug likely produced and dispensed massive volumes of the Fraudulent Compounded Pain Creams to patients resulting in millions of dollars in claims submitted to various insurers.

142.    The Defendants' creation and dispensation of predetermined, compounded drug products in large volumes, renders Satya Drug in violation of both state and federal licensing laws regulating the safe manufacturing of drugs. See 21 U.S.C. § 355 and 21 U.S.C. 353a(a).

143.    Furthermore, by acting akin to drug manufacturers and dispensers, the Defendants violated 21 U.S.C. § 355(a) which states that "no person shall introduce or deliver for introduction into interstate commerce any new drug" without first obtaining approval to do so by way of an application filed with the Secretary with respect to that drug.

144.    A "new drug" – as defined by 21 U.S.C. § 321(p)(1) – is "any drug…the composition of which is such that such drug is not generally recognized…as safe and effective for use under the conditions prescribed, recommended or suggested in the labeling thereof."

145.    Satya Drug's Fraudulent Compounded Pain Creams were never FDA-approved and, therefore, were never verified by the FDA as being safe, effective, or quality products.  In fact, Satya Drug's bulk compounding and dispensing of the Fraudulent Compounded Pain Creams

exposed Insureds to widespread risks including therapeutic duplication and harmful contraindications, which is why they should only be prescribed under limited and unique circumstances.

### E.   The Prescription and Dispensation of Satya Drug's Fraudulent Compounded Pain Creams Was Contrary to Evidenced-Based Medical Practices

146.   In keeping with the fact that the Fraudulent Compounded Pain Creams were prescribed pursuant to the Defendants' fraudulent scheme intended to generate profits from insurers, Satya Drug's Fraudulent Compounded Pain Creams (i) have no medical efficacy based on the purported symptoms of the patients receiving the compounded products, and (ii) were prescribed without any legitimate reason to provide the patients with expensive compounded products – which include drugs whose efficacy in topical form is undocumented and unsupported – when there are many other widely accepted, proven effective alternatives with well-documented therapeutic benefits commercially available at considerably lower costs.

147.   Topical compounded pain creams should be the last prescribed intervention, after oral medications are not tolerated or are deemed ineffective or contraindicated, as well as after any FDA-approved manufactured topical products have been shown to provide no pain relief to the patient.

148.   For a topical formulation to be effective, it must first penetrate the skin.  In general, creams are less effective than gels or sprays.

149.   The skin is composed of three layers: epidermis, dermis, and hypodermis.  Within the epidermis, the stratus corneum is the outermost layer of the skin that serves as the main barrier to drug entry.  For analgesic medicines to be absorbed through the skin, they must contain optimal

drug combinations, effective concentrations of each drug, and a compounding base with the appropriate physiochemical properties to facilitate absorption.

150.     For a drug to alleviate pain, it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

151.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated – those with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease or congestive heart failure).

152.     Satya Drug's Fraudulent Compounded Pain Creams contain combinations of drugs that make no clinical sense and have no efficacious value in treating musculoskeletal and neuropathic injuries – even assuming the Insureds actually suffered from such injuries.

153.     There are no published, peer-reviewed, controlled studies to support that patients who suffer from musculoskeletal pain or neuropathy have achieved any therapeutic effect from using topical pain creams containing the drugs that are part of the Fraudulent Compounded Pain Creams.

154.     Further, many of the Fraudulent Compounded Pain Creams are available in alternative oral formulations or are commercially available in different topical formulations for a fraction of the cost.

155.     The alternatives to the Fraudulent Compounded Pain Creams, whether in oral formulations or commercially available topical formulations, have proven to therapeutically

benefit patients suffering from pain, are FDA-approved, and are commonly prescribed by healthcare providers who utilize evidence-based medicine for their prescribing practices.

156.    Contrary to evidenced-based medical practices, in exchange for kickbacks or other financial incentives, the Prescribing Providers routinely prescribed the Fraudulent Compounded Pain Creams without regard to whether other forms of oral and/or topical medications approved for the treatment of pain failed, or whether there was a contraindication for their use.

157.    The Prescribing Providers failed to practice evidence-based medicine.

158.    The Prescribing Providers failed to recommend that the Insureds try OTC or prescription FDA-approved topical medications and to assess their effectiveness, prior to prescribing one of the Fraudulent Compounded Pain Creams mass produced and dispensed by the Defendants.

159.    The Prescribing Providers also continuously failed to document in their examination reports whether the patients were intolerant of commercially available products, or whether any commercially available products were recommended to the patient but failed.

160.    The Prescribing Providers also continuously failed to document in their examination reports why any compounded drug product was medically necessary, or why the Fraudulent Compounded Pain Cream they ultimately prescribed for the patient was medically necessary.

161.    The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Compounded Pain Cream prescribed to a particular patient was actually used by the patient.

162.     The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Compounded Pain Cream provided any pain relief to the patient or was otherwise effective for the purpose prescribed.

163.     The Prescribing Providers plainly and continuously failed to prescribe individually tailored compounded products, made for an individual Insured, which produced a significant difference between the compounded drug and a comparable commercially available FDA-approved product.

164.     Likewise, Satya Drug never dispensed individually tailored compounded products, made for an identified individual Insured, which produced a significant difference between the compounded drug and a comparable commercially available product. Rather, the Prescribing Providers routinely used preset labels or stamps to prescribe predetermined Fraudulent Compounded Pain Creams (i.e., Compound D5 and Compound D7) pursuant to predetermined protocols and illegal, collusive arrangements with the Defendants. At times, the Prescribing Providers prescribed, and the Defendants dispensed the Fraudulent Compounded Pain Creams contemporaneously to other Fraudulent Pharmaceuticals. For example:

- Insured J.V. was allegedly involved in a motor vehicle accident on January 7, 2015. Thereafter, J.V. sought treatment with Jordan Sudberg M.D. P.C. at a clinic located at 2805 Veterans Memorial Highway, Ronkonkoma, New York. On January 22, 2015, J.V. underwent an initial examination with Jordan Sudberg, M.D. ("Dr. Sudberg") who *only* recommended over the counter Motrin to the Insured. Yet, on January 23, 2015, MSB Rx – another Bassanell owned pharmacy – dispensed and billed for Compound D5 pursuant to a prescription issued by Dr. Sudberg on January 22, 2015 with two refills. On February 23, 2015, MSB Rx dispensed and billed for a refill of Compound D5 pursuant to Dr. Sudberg's January 22, 2015 prescription. Notably, Dr. Sudberg issued a **second prescription** on January 22, 2015 for a **second compounded pain cream** – Compound D7 – with two refills. On March 24, 2015, Satya Drug dispensed and billed for Compound D7 pursuant to a prescription issued by Dr. Sudberg – using a preset label or stamp – on January 22, 2015.  Notably, none of the examinations of the Insured performed by Dr. Sudberg indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.

- Insured B.K. was allegedly involved in a motor vehicle accident on November 4, 2015. Thereafter, B.K. sought treatment with J.S. Medical P.C. at a No-Fault Clinic located at 153-01 Northern Boulevard, Flushing, New York. On November 17, 2015, B.K. underwent an initial examination with Dr. Sudberg who – using a preset label or stamp – issued a prescription for Compound D7 with one (1) refill. On November 18, 2015, Satya Drug dispensed and billed for Compound D7 pursuant to a prescription issued by Dr. Sudberg on November 17, 2015. On December 17, 2015, Satya Drug dispensed and billed for a refill of Compound D7 pursuant to Dr. Sudberg's November 17, 2015 prescription. Notably, none of the examinations of the Insured performed by Dr. Sudberg indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. In fact, Dr. Sudberg recommended that the patient continue to use OTC pain medications.

- Insured W.H. was allegedly involved in a motor vehicle accident on April 2, 2015. Thereafter, W.H. sought treatment with the Office of Daniel Khaimov, M.D. at a No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, New York, and underwent an initial examination with Yakov Yakubov, P.A. ("Yakubov") on June 18, 2015. On June 25, 2015, Satya Drug dispensed and billed for Compound D5 pursuant to a prescription issued by Yakubov on June 18, 2015 with three (3) refills. Notably, Yakubov did not recommend the Insured receive any prescription medication at the time of his initial examination. Further, on August 6, 2015, Satya Drug dispensed and billed for a refill of Compound D5 pursuant to Yakubov's June 18, 2015 prescription. Notably, none of the examinations of the Insured performed by Yakubov indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.

- Insured T.P. was allegedly involved in a motor vehicle accident on January 6, 2016. Thereafter, T.P. sought treatment with J.S. Medical P.C. at a No-Fault Clinic located at 153-01 Northern Blvd., Flushing, New York. On January 12, 2016, T.P. underwent an initial examination with Dr. Sudberg who – using a preset label or stamp – issued a prescription for Compound D7 with one (1) refill. On January 27, 2016, Satya Drug dispensed and billed for Compound D7 pursuant to a prescription issued by Dr. Sudberg on January 12, 2016.  On February 26, 2016, Satya Drug dispensed and billed for a refill of Compound D7 pursuant to Dr. Sudberg's January 12, 2016 prescription. Notably, none of the examinations of the Insured performed by Dr. Sudberg indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed. In fact, Dr. Sudberg recommended that the patient continue to use OTC pain medications.

- Insured E.L. was allegedly involved in a motor vehicle accident on November 21, 2015. Thereafter, E.L. sought treatment with Health Balance Medical, P.C. at a No-Fault Clinic located at 92-07 Roosevelt Avenue, Jackson Heights, New York. On November 24, 2015, E.L. underwent an initial examination with Mani Ushyarov, D.O. ("Dr. Ushyarov") who issued a prescription for a compounded pain cream ("Compound

RX").  On December 1, 2015, another pharmacy – New Century Pharmacy, Inc. – dispensed and billed for Compound RX pursuant to a prescription issued by Dr. Ushyarov on November 24, 2015. On January 5, 2016, Refill Rx Pharmacy, Inc. – another pharmacy – dispensed and billed for another compounded pain cream ("Compound Rx 2") pursuant to a prescription issued by Dr. Ushyarov on December 24, 2015.  On March 31, 2016, E.L. underwent a follow-up examination with Dr. Ushyarov who – using a preset label or stamp – issued a prescription for Compound D5.  On April 4, 2016, Satya Drug dispensed and billed for Compound D5 pursuant to a prescription issued by Dr. Ushyarov on March 31, 2016. Notably, none of the examinations of the Insured performed by Dr. Ushyarov indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.

- Insured D.I. was allegedly involved in a motor vehicle accident on February 17, 2015.  Thereafter, D.I. sought treatment with the Office of Daniel Khaimov at a No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, New York. On June 3, 2015, D.I. underwent an initial examination with Yakubov who did not recommend the Insured receive any prescription medication.  On June 9, 2015, Satya Drug dispensed and billed for Compound D5 pursuant to a prescription issued with three (3) refills by Yakubov on June 4, 2015 — the day <u>after</u> the initial examination – using a preset label or stamp.  Satya Drug dispensed and billed for refills of Compound D5 on July 9, 2015, August 6, 2015, and September 17, 2015. Notably, none of the examinations of the Insured performed by Yakubov indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.

- Insured N.V. was allegedly involved in a motor vehicle accident on May 28, 2016.  Thereafter, N.V. sought treatment with Health Balance Medical, P.C. at a No-Fault Clinic located at 92-07 Roosevelt Avenue, Jackson Heights, New York. On June 16, 2016, N.V. underwent an initial examination with Dr. Ushyarov who issued a prescription for Compound D5 – using a preset label or stamp – with no refill.  On July 18, 2016, Satya Drug dispensed and billed for Compound D5 pursuant to a prescription issued by Dr. Ushyarov on June 16, 2016.  On September 30, 2016, Taira Rx – a Bassanell owned pharmacy – dispensed and billed for a compounded pain gel, Diclofenac Gel 3% with Lidocaine 5% Ointment pursuant to a prescription issued by Dr. Ushyarov on September 29, 2016.  Notably, none of the examinations of the Insured performed by Dr. Ushyarov indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.

- Insured R.S. was allegedly involved in a motor vehicle accident on December 4, 2015.  Thereafter, R.S. sought treatment with Health Balance Medical, P.C. at a No-Fault Clinic located at 92-07 Roosevelt Avenue, Jackson Heights, New York, and underwent an initial examination on December 17, 2015.  On April 19, 2016, R.S. underwent a follow up examination with Dr. Ushyarov who issued a prescription – using a preset label or stamp – for Compound D5 with no refill. On May 13, 2016, Satya Drug

dispensed and billed for Compound D5 pursuant to a prescription issued by Dr. Ushyarov on April 19, 2016. Notably, none of the examinations of the Insured performed by Dr. Ushyarov indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.

- Insured S.H. was allegedly involved in a motor vehicle accident on April 11, 2015. Thereafter, S.H. sought treatment with A. Baldonado Medical, P.C. at a No-Fault Clinic located at 293 E. 53rd Street, Brooklyn, New York. On September 11, 2015, S.H. underwent a follow-up examination with Alexander Baldonado, M.D. ("Dr. Baldonado") who did not recommend the Insured receive any prescription medication. Yet, on September 18, 2015, Satya Drug dispensed and billed for Naprelan (Naprosyn) and Compound D5 pursuant to a prescription issued by Dr. Baldonado on September 14, 2015 (three days *after* the follow-up examination) – using a preset label or stamp – with three (3) refills each.  On October 16, 2015, November 14, 2015, and December 11, 2015, Satya Drug dispensed refills of Naprelan and Compound D5 pursuant to Dr. Baldonado's September 14, 2015 prescriptions.  Notably, none of the examinations of the Insured performed by Dr. Baldonado indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.

- Insured B.H. was allegedly involved in a motor vehicle accident on September 16, 2015. Thereafter, B.H. sought treatment with JPS Medical P.C. at a No-Fault Clinic located at 133-29 41st Road, Flushing, New York and underwent an initial examination with Dr. Sudberg on September 26, 2015. On October 10, 2015, B.H. underwent a follow-up examination with Dr. Sudberg. On October 10, 2015, Satya Drug dispensed and billed for Compound D7 and Mobic pursuant to prescriptions issued by Dr. Sudberg on October 10, 2015. In support of these pharmaceuticals, Satya Drug submitted copies of Dr. Sudberg's October 10, 2015 prescriptions. Notably, Dr. Sudberg issued a prescription for Compound D5, not Compound D7. On November 9, 2015, Satya Drug again dispensed and billed for Compound D7 and Mobic pursuant to the **same exact prescriptions** issued by Dr. Sudberg on October 10, 2015, despite the fact that the prescriptions did not authorize any refills. Notably, none of the examinations of the Insured performed by Dr. Sudberg indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.  Further, on November 21, 2015, B.H. underwent another follow-up examination with Dr. Sudberg. On November 21, 2015, Satya Drug dispensed and billed for Terocin 4% Patch pursuant to a prescription issued by Dr. Sudberg on November 21, 2015 with one refill. On December 17, 2015, Satya Drug dispensed and billed for a refill of Terocin 4% Patch pursuant to the November 21, 2015 prescription.

- Insured S.L. was allegedly involved in a motor vehicle accident on February 16, 2016. Thereafter, S.L. sought treatment with Health Balance Medical, P.C. at a No-Fault Clinic located at 92-07 Roosevelt Avenue, Jackson Heights, New York. On March 3, 2016, S.L. underwent an initial examination with Dr. Ushyarov who issued a

prescription – using a preset label or stamp – for Compound D5 with no refills. On March 9, 2016, Satya Drug dispensed and billed for Compound D5 pursuant to the prescription issued by Dr. Ushyarov on March 3, 2016. Notably, none of the examinations of the Insured performed by Dr. Ushyarov indicate a legitimate need for a uniquely tailored compounded medication or that any other forms of oral and/or topical medications approved for the treatment of pain failed.  Further, on June 27, 2016, Satya Drug dispensed and billed for Terocin 4% Patch pursuant to a prescription issued on June 14, 2016 by Dr. Ushyarov with no refills. Notably, there is no corresponding examination of S.L. on or about June 14, 2016 by Dr. Ushyarov. Further, on July 23, 2016, Satya Drug dispensed and billed for a refill of Terocin 4% Patch pursuant to the prescription issued by Dr. Ushyarov on June 14, 2016 despite the fact that the prescription did not authorize any refills.

165.    Further, pursuant to collusive arrangements and predetermined protocols, Prescribing Providers prescribed, and the Defendants dispensed additional Fraudulent Compounded Pain Creams i.e., Diclofenac Gel 3% with Lidocaine 5% Ointment with multiple refills using preset labels or stamps and directed the prescriptions to Satya Drug. For example:

- Insured V.S. was allegedly involved in a motor vehicle accident on July 15, 2015. Thereafter, V.S. sought treatment with the Office of Daniel Khaimov, M.D. at a No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, New York. On August 27, 2015, V.S. underwent an examination with Daniel Khaimov, M.D. ("Dr. Khaimov") who did not recommend the Insured receive any prescription medication. On September 5, 2015, Satya Drug dispensed and billed for Diclofenac Gel 3% with Lidocaine 5% Ointment pursuant to a prescription issued with three (3) refills by Yakubov on August 27, 2015, even though he did not examine the Insured on that date. Satya Drug dispensed and billed for refills of Diclofenac Gel 3% with Lidocaine 5% Ointment on October 5, 2015, October 31, 2015, and November 27, 2015.

- Insured A.J. was allegedly involved in a motor vehicle accident on July 21, 2015. Thereafter, A.J. sought treatment with the Office of Daniel Khaimov, M.D. at a No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, New York. On August 27, 2015, A.J. underwent an examination with Dr. Khaimov who did not recommend the Insured receive any prescription medication. On September 5, 2015, Satya Drug dispensed and billed for Diclofenac Gel 3% with Lidocaine 5% Ointment pursuant to a prescription issued with three (3) refills by Yakubov on August 27, 2015, even though he did not examine the Insured on that date. Satya Drug dispensed and billed for refills of Diclofenac Gel 3% with Lidocaine 5% Ointment on October 5, 2015 and November 2, 2015.

- Insured M.W. was allegedly involved in a motor vehicle accident on June 5, 2015. Thereafter, M.W. sought treatment with the Office of Daniel Khaimov, M.D. at a No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, New York. On August 27, 2015,

M.W. underwent an examination with Dr. Khaimov who did not recommend the Insured receive any prescription medication. On September 5, 2015, Satya Drug dispensed and billed for Diclofenac Gel 3% <u>with</u> Lidocaine 5% Ointment pursuant to a prescription issued with three (3) refills by Yakubov on August 27, 2015, even though he did not examine the Insured on that date. Satya Drug dispensed and billed for refills of Diclofenac Gel 3% <u>with</u> Lidocaine 5% Ointment on October 5, 2015, October 30, 2015, and November 30, 2015.

- Insured T.W. was allegedly involved in a motor vehicle accident on June 5, 2015. Thereafter, T.W. sought treatment with the Office of Daniel Khaimov, M.D. at a No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, New York, and underwent an examination on August 27, 2015. On September 11, 2015, Satya Drug dispensed and billed for Diclofenac Gel 3% <u>with</u> Lidocaine 5% Ointment pursuant to a prescription issued with three (3) refills by Yakubov on August 27, 2015. Satya Drug dispensed and billed for refills of Diclofenac Gel 3% <u>with</u> Lidocaine 5% Ointment on October 9, 2015 and November 6, 2015.

166.    The prescription and combination of drugs used in the Fraudulent Compounded Pain Creams, as well as the prescription of additional Fraudulent Topical Pain Products was merely a means for the Defendants to inflate their billing and maximize their charges to exploit New York automobile insurance carriers, as pharmacy providers are ordinarily statutorily reimbursed for each individual ingredient contained in a compounded drug product.  As a result, the more drug ingredients that Satya Drug included in its Fraudulent Compounded Pain Creams, the more the Defendants could bill under the name of Satya Drug.

### F.  The Fraudulent Diclofenac Gel and Lidocaine Ointment Prescriptions

167.    In accordance with the fraudulent scheme discussed above, once Satya Drug ceased its illegal operation as a manufacturer of the Fraudulent Compounded Pain Creams, it targeted and routinely billed GEICO for exorbitantly priced Fraudulent Topical Pain Products, primarily in the form of Diclofenac Gel 3% pursuant to duplicitous prescriptions solicited from Prescribing Providers and Clinic Controllers, in exchange for kickbacks or other financial incentives.

168.    The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for Diclofenac Gel 3% because the Defendants could bill for this product at exorbitant charges, which egregiously inflated the charges submitted to GEICO and other New York No-Fault insurers.

169.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

170.    A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA, and is designated to call attention to serious or life-threatening risks associated with the drug or product.

171.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient to be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

172.    Diclofenac sodium gel, when prescribed in 1% concentrations, is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.  It has not been proven effective for treating strains or sprains.

173.    Diclofenac Gel 3%, i.e., the Diclofenac Gel prescribed by the Prescribing Providers and dispensed by the Defendants, is FDA approved to treat a skin condition known as actinic keratoses.

174.    Diclofenac Gel 3% has no proven efficacy or safety in the treatment of musculoskeletal injuries, nor is the use of Diclofenac Gel 3% to treat musculoskeletal injuries an accepted off-label use.

175.    Notwithstanding the most common uses for Diclofenac Gel 3%, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Diclofenac Gel 3%, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – such as Meloxicam (or its brand name equivalent, Mobic), Nabumetone or naproxen – and other Fraudulent Pharmaceuticals.

176.    Prescribing Diclofenac Gel 3%, while simultaneously prescribing or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

177.    Nevertheless, Prescribing Providers consciously prescribed and the Defendants consciously dispensed Diclofenac Gel 3%, in conjunction with oral NSAIDs and/or Fraudulent Pharmaceuticals to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.

178.    At times, pursuant to the fraudulent scheme spearheaded by Bassanell, the Defendants dispensed Diclofenac Gel 3% and other Fraudulent Pharmaceuticals to a single patient through both Satya Drug and RKD Rx, as well as other Bassanell owned pharmacies in order to conceal the voluminous billing submitted to GEICO for each patient. For example:

- Insured A.B. was allegedly involved in a motor vehicle accident on July 6, 2018. Thereafter, A.B. sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 105-10 Flatlands Avenue, Brooklyn, New York, and underwent an initial examination on July 11, 2018. On August 13, 2018, A.B. underwent a follow-up examination with Dr. Rivera-Iturbe who issued prescriptions for Diclofenac Gel 3%, Lidocaine 5% Patch and Baclofen.  On August 14, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patch, and Baclofen pursuant to prescriptions issued by Dr. Rivera-Iturbe on August 14 2018 – the day *following* the follow-up examination. On September 13, 2018, A.B. underwent another follow-up examination with Dr. Rivera-Iturbe. On September 21, 2018, Satya Drug dispensed and billed for Diclofenac Gel 3%, Lidocaine 5% Patch, and Methocarbamol pursuant to prescriptions issued by Dr. Rivera-Iturbe on September 21, 2018 – eight (8) days *after* the follow-up examination with Dr. Rivera-Iturbe.

- Insured J.M. was allegedly involved in a motor vehicle accident on June 9, 2018. Thereafter, J.L. sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent an initial examination on June 12, 2018 with Dr. Kelly who the *following* day issued a prescription for Diclofenac Gel 3% with one refill. On June 13, 2018, KZ Pharmacy – a Bassanell owned pharmacy – dispensed and billed for Diclofenac Gel 3% pursuant to a prescription issued by Dr. Kelly on June 13, 2018. On June 28, 2018, KZ Pharmacy dispensed and billed for a refill of Diclofenac Gel 3% pursuant to Dr. Kelly's June 13, 2018 prescription. On August 14, 2018, J.M. underwent a pain management initial consultation with Alexander Zhuravkov, M.D. ("Dr. Zhuravkov") of Metro Pain Specialists, P.C. During the initial examination, Dr. Zhuravkov recommended oral NSAIDs to the Insured, yet he issued a prescription for Diclofenac Gel 3% with one refill. On August 17, 2018, J.M. also underwent a follow-up examination with Dr. Kelly who recommended and issued a prescription for Lidocaine 5% Patch. On August 20, 2018, RDK Rx dispensed and billed for Lidocaine 5% Patch pursuant to a prescription issued by Dr. Kelly on August 20, 2018 – **three** days *after* the follow-up examination with Dr. Kelly. Further, on August 22, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% pursuant to a prescription issued by Dr. Zhuravkov on August 14, 2018. On September 4, 2018, RKD Rx dispensed and billed for a refill of Diclofenac Gel 3% pursuant to Dr. Zhuravkov's August 14, 2018 prescription. On September 11, 2018, J.M. underwent a follow-up with Dr. Zhuravkov who recommend oral NSAIDs to the Insured, yet **again** issued a prescription for Diclofenac Gel 3% with one refill. On September 17, 2018, Satya Drug dispensed and billed for Diclofenac Gel 3% pursuant to a prescription issued by Dr. Zhuravkov on September 11, 2018. On October 2, 2018, Satya Drug dispensed and billed for a refill of Diclofenac Gel 3% pursuant to Dr. Zhuravkov's September 11, 2018.

- Insured E.G. was allegedly involved in a motor vehicle accident on April 28, 2018. Thereafter, E.G. sought treatment with Ralph Innovative Medical, P.C. at a No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, New York. On May 4, 2018, E.G. underwent an initial examination with Sheila Soman, M.D. ("Dr. Soman") who issued a prescription for Diclofenac Gel 3% with one (1) refill.  On May 18, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% pursuant to a prescription issued by Dr. Soman on May 4, 2018.  On June 24, 2018, RKD Rx dispensed and billed for a refill of Diclofenac Gel 3% pursuant to Dr. Soman's May 4, 2018 prescription. On July 10, 2018, E.G. underwent a follow-up examination with Dr. Soman who did not recommend the Insured receive any prescription medication. Yet, on July 20, 2018, Satya Drug dispensed and billed for Diclofenac Gel 3% pursuant to a prescription issued with one (1) refill by Dr. Soman on July 10, 2018. On August 4, 2018, Satya Drug dispensed and billed for a refill of Diclofenac Gel 3% pursuant to Dr. Soman's July 10, 2018 prescription.

- Insured B.D. was allegedly involved in a motor vehicle accident on May 15, 2017. Thereafter, B.D. sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent an

initial examination with Dr. Kelly on January 29, 2018. On February 1, 2018, RKD Rx dispensed and billed for Lidocaine 5% Patch pursuant to a prescription issued by Dr. Kelly on January 30, 2018 – the day *following* the initial examination. On March 5, 2018, B.D. underwent a follow-up examination with Dr. Kelly. On March 6, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% pursuant to a prescription issued by Dr. Kelly with one (1) refill on March 6, 2016 – the day after the follow-up examination. On March 21, 2018, RKD Rx dispensed and billed for a refill of Diclofenac Gel 3% pursuant to Dr. Kelly's March 6, 2018 prescription. On May 11, 2018, B.D. underwent another follow-up examination with Dr. Kelly. On May 14, 2018, RKD Rx dispensed and billed for Lidocaine 5% Patch pursuant to a prescription issued by Dr. Kelly on May 14, 2018 – three (3) days after the follow-up examination. On July 19, 2018, B.D. underwent another follow-up examination with Dr. Kelly. On July 24, 2018, Satya Drug dispensed and billed for Lidocaine 5% Patch pursuant to a prescription issued by Dr. Kelly on July 23, 2018 – four (4) days after the follow-up examination.

- Insured E.H. was allegedly involved in a motor vehicle accident on May 26, 2018. Thereafter, E.H. sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 204-12 Hillside Avenue, Hollis, New York, and underwent an initial examination with Dr. Kelly on May 29, 2018. On May 30, 2018, KZ Pharmacy – a Bassanell owned pharmacy—dispensed and billed for Diclofenac Gel 3% and Naproxen (Naprosyn) — two drug products from the same therapeutic class – a topical and oral NSAID, as well as Cyclobenzaprine pursuant to prescriptions issued by Dr. Kelly on May 30, 2018 – a day after the initial examination. On June 15, 2018, KZ Pharmacy dispensed and billed for a refill of Diclofenac Gel 3%, and in support of the charge, submitted the **same exact prescription** issued by Dr. Kelly on May 30, 2018, despite the fact that the prescription does not authorize any refills of Diclofenac Gel 3%. On July 31, 2018, E.H. underwent a follow-up examination with Dr. Kelly who recommended the prescription of Flexeril (Cyclobenzaprine). On August 1, 2018, Satya Drug dispensed and billed for Cyclobenzaprine pursuant to a prescription issued by Dr. Kelly on August 1, 2018. Satya Drug did not submit a copy of Dr. Kelly's prescription in support of its charges. On August 14, 2018, E.H. underwent an initial pain management consultation with Dr. Zhuravkov who recommended that the Insured continue to use oral NSAIDs. Yet, on August 22, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% pursuant to a prescription issued by Dr. Zhuravkov with one (1) refill on August 14, 2018. On August 27, 2018, E.H. underwent another follow-up examination with Dr. Kelly who the *following* day issued a prescription for Naproxen. On August 28, 2018, RKD Rx dispensed and billed for Naproxen (Naprosyn) pursuant to the prescription issued by Dr. Kelly on August 28, 2018.  Further, on September 6, 2018, RKD Rx dispensed and billed for a refill of Diclofenac Gel 3% pursuant to Dr. Zhuravkov's August 14, 2018 prescription.

- Insured E.W. was allegedly involved in a motor vehicle accident on May 29, 2018. Thereafter, E.W. sought treatment with Metro Pain Specialists, P.C. at a No-Fault Clinic located at 105-10 Flatlands Avenue, Brooklyn, New York. On June 4, 2018,

E.W. underwent an initial examination with Dr. Rivera-Iturbe who issued prescriptions for Lidocaine 5% Patch, Relafen (Nabumetone), and Flexeril (Cyclobenzaprine). On June 6, 2018, KZ Pharmacy – a Bassanell owned pharmacy – dispensed and billed for Lidocaine 5% Patch, Nabumetone, and Cyclobenzaprine pursuant to prescriptions issued by Dr. Rivera-Iturbe on June 4, 2018. On June 26, 2018, E.W. underwent an initial pain management consultation with Dr. Zhuravkov who recommended that the Insured continue to use oral NSAIDs. Yet, on June 26, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% pursuant to a prescription issued by Dr. Zhuravkov on June 26, 2018. On July 11, 2018, RKD Rx dispensed and billed for a refill of Diclofenac Gel 3%, and in support of the charge, submitted the **_same exact prescription_** issued by Dr. Zhuravkov on June 26, 2018, despite the fact that the prescription does not authorize any refills of Diclofenac Gel 3%. On July 20, 2018, E.W. underwent a follow-up examination with Dr. Rivera-Iturbe who <u>three</u> (3) days _later_ issued a prescription for Diclofenac Gel 3% with no refills. On July 24, 2018, Satya Drug dispensed and billed for Diclofenac Gel 3% pursuant a prescription issued by Dr. Rivera-Iturbe on July 23, 2018. On August 8, 2018, Satya Drug dispensed and billed for a refill of Diclofenac Gel 3%, and in support of the charge, submitted the **_same exact prescription_** issued by Dr. Rivera-Iturbe on July 23, 2018, despite the fact that the prescription does not authorize any refills of Diclofenac Gel 3%.

- Insured I.O. was allegedly involved in a motor vehicle accident on July 30, 2018. Thereafter, I.O. sought treatment with Smart Choice Medical, P.C. at a No-Fault Clinic located at 409 Rockaway Avenue, Brooklyn, New York. On August 3, 2018, I.O. underwent an initial examination with Dr. Abayev who issued a prescription for Diclofenac Gel 3%. On August 3, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% pursuant to a prescription issued by Dr. Abayev on August 3, 2018. On August 18, 2018, RKD Rx dispensed and billed for a refill of Diclofenac Gel 3% pursuant to Dr. Abayev's August 3, 2018 prescription. However, RKD Rx did not submit a copy of the August 3, 2018 prescription in support of its charges. On September 26, 2018, I.O. underwent a follow-up examination with Dr. Abayev who issued prescriptions for Lidoderm (Lidocaine) 5% Patch and Mobic. On September 26, 2018, Satya Drug dispensed and billed for Lidocaine 5% Patch and Meloxicam (Mobic) pursuant to prescriptions issued by Dr. Abayev on September 26, 2018.

179.    Moreover, in keeping with the fact that Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated

the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed diclofenac sodium.

180.    In further keeping with the fact that Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers virtually never addressed whether the Diclofenac Gel 3% prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

181.    The fact that the Prescribing Providers failed to properly document the prescriptions for the Diclofenac Gel 3% further indicates that there was no legitimate medical reason for the excessive amounts of Diclofenac Gel 3% dispensed by the Pharmacies, particularly given the potential for adverse health effects to the Insureds.

182.    Satya Drug typically billed GEICO between $1,179.46 to $2,364.00 for a single tube of Diclofenac Gel 3%, while RKD Rx typically billed GEICO $1,184.50 for a single tube of Diclofenac Gel 3%. The Defendants' total billing submitted through the Pharmacies for Diclofenac Gel 3% exceeds $1.4 million dollars.

183.    Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services issued a report which noted that one of the most common products billed for by pharmacies with questionable billing was diclofenac sodium. In that same report, the OIG also noted that many pharmacies in New York State are among the most questionable in the nation. See

_Questioning Billing For Compounded Topical Drugs in Medicare Part D_, OEI-02-1600440 (August 2018).

184.    In addition to the egregious volume of Diclofenac Gel 3% dispensed by the Pharmacies, in accordance with the fraudulent scheme discussed above, at times, the Defendants billed GEICO – through Satya Drug – for exorbitantly priced topical Lidocaine 5% Ointment, pursuant to prescriptions solicited from the Prescribing Providers and Clinic Controllers, in exchange for kickbacks or other financial incentives.

185.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body. Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.  Notably, lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

186.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, confusion, dizziness, tremors, convulsions, respiratory depression, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

187.    Despite this, the Prescribing Providers never recommended Insureds first use OTC Lidocaine products to treat minor aches and pains which they sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols,

the Prescribing Providers and Clinic Controllers routinely prescribed to Insureds, or caused the prescription of Lidocaine 5% Ointment and directed those prescriptions to Satya Drug.

188.    For example, the Prescribing Providers never recommended Insureds first try commonly available commercial products, such as Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available in a 2.7 oz. tube at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices in the range of $10.00 or less.

189.    As with the prescriptions for Diclofenac Gel 3%, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescriptions.

190.    Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

191.    Satya Drug typically billed GEICO between $747.90 and $1,931.36, with charges at times exceeding $2,000.00 for a single tube of Lidocaine 5% Ointment.

192.    In further keeping with the fact that the Defendants targeted a specific set of pharmaceuticals (i.e., the Fraudulent Topical Pain Products) pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Prescribing Providers issued nearly identical prescriptions to Insureds involved in a single motor vehicle accident, regardless of the Insured's individual circumstances or actual injuries. For example:

- On July 31, 2015, two Insureds, A.A. and L.J.P. were involved in the same accident. Thereafter, A.A. and L.J.P. sought treatment with Global Rehabilitation Medical, P.C.

at a No-Fault Clinic located at 97-01 66th Avenue, Rego Park, NY, and underwent initial examinations on August 3, 2015 with Oleg Fuzaylov, M.D. ("Dr. Fuzaylov"). Notably, Dr. Fuzaylov directed A.A. and L.J.P. to take the same Fraudulent Pharmaceuticals, namely, Lidocaine 5% Patch, Robaxin (Methocarbamol), Diclofenac Gel 1%, and Duexis. On August 3, 2015 and August 4, 2015, Satya Drug dispensed and billed for Lidocaine 5% Patch, Robaxin (Methocarbamol), Diclofenac Gel 3% (not Diclofenac Gel 1% as issued on the prescriptions), and Duexis to A.A. and L.J.P. pursuant to prescriptions dated August 3, 2015.

- On April 26, 2015, two Insureds, J.K. and C.S. were involved in the same accident. Thereafter, J.K. and C.S. sought treatment with Azu Ajudua, M.D. at a No-Fault Clinic located at 105-10 Flatlands Avenue, Brooklyn, NY and underwent initial examinations with Dr. Ajudua on April 28, 2015 and May 5, 2015, respectively. Dr. Ajudua directed J.K. and C.S. to take the same Fraudulent Pharmaceuticals, namely, Diclofenac Gel 3%, Terocin 4% Patches, Motrin (Ibuprofen), and Nexium. On May 1, 2015, and May 6, 2015, Satya Drug dispensed and billed for Diclofenac Gel 3%, Terocin 4% Patches, Ibuprofen, and Nexium to J.K. and C.S. pursuant to prescriptions issued by Dr. Ajudua.

- On June 2, 2016, two Insureds, B.C. and D.B. were involved in the same accident. Thereafter, B.C. and D.B. sought treatment with First Class Medical P.C. at a No-Fault Clinic located at 87-15 115th Street, Richmond Hill, NY, and underwent initial examinations with Dr. Ushyarov on June 16, 2016. Dr. Ushyarov directed B.C. and D.B. to take the same Fraudulent Pharmaceutical, namely, Diclofenac Gel 3% with Lidocaine 5% Ointment, a compounded pain gel. On July 16, 2016 and July 18, 2016, Satya Drug dispensed and billed for Diclofenac Gel 3% with Lidocaine 5% Ointment to B.C. and D.B., respectively, pursuant to prescriptions dated June 16, 2016.

- On February 3, 2018, three Insureds, A.P., C.P., and M.P. were involved in the same accident. Thereafter, A.P., C.P., and M.P. sought treatment with Ralph Innovative Medical P.C. at a No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, NY and underwent examinations with Dr. Soman. A.P. and C.P. underwent initial examinations with Dr. Soman on February 13, 2018, while M.P. underwent an initial examination with Dr. Soman on February 23, 2018. Dr. Soman directed A.P., C.P. and M.P. to take the same Fraudulent Pharmaceutical, namely, Diclofenac Gel 3% with one (1) refill. On February 13, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% to A.P. and C.P. pursuant to prescriptions dated February 13, 2018 and a refill was dispensed on February 28, 2018. Moreover, on February 23, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% to M.P. pursuant to a prescription dated February 23, 2018 and a refill was dispensed on March 10, 2018.

- On April 11, 2018, four Insureds, C.H., D.J., F.P., and N.B. were involved in the same accident. Thereafter, C.H., D.J., F.P., and N.B. sought treatment with Ralph Innovative Medical P.C. at a No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, NY, and underwent examinations with Dr. Soman. C.H., D.J., and F.P. underwent initial examinations with Dr. Soman on April 13, 2018, while N.B. underwent an initial examination with Dr. Soman on April 18, 2018. Dr. Soman directed C.H., D.J., F.P.,

and N.B. to take the same Fraudulent Pharmaceutical, namely, Diclofenac Gel 3% with one (1) refill. On April 24, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% to C.H., D.J., F.P., and N.B. pursuant to prescriptions by Dr. Soman and a refill was dispensed on May 9, 2018.

- On June 27, 2018, two Insureds, S.J. and K.B. were involved in the same accident. Thereafter, S.J. and K.B. sought treatment with Ralph Innovative Medical P.C. at a No-Fault Clinic located at 2363 Ralph Avenue, Brooklyn, NY, and underwent examinations with Dr. Soman on June 29, 2018 and July 6, 2018, respectively. Dr. Soman directed S.J. and K.B. to take the same Fraudulent Pharmaceutical, namely, Diclofenac Gel 3% with one (1) refill. On July 10, 2018 and July 14, 2018, RKD Rx dispensed and billed for Diclofenac Gel 3% to K.B. and S.J., respectively, pursuant to prescriptions by Dr. Soman. On July 25, 2018, RKD Rx dispensed and billed for a refill of Diclofenac Gel 3% to K.B. and S.J.

193. The Defendants' egregious billing in predetermined patterns, coupled with the fact that the Prescribing Providers failed to properly document the prescriptions for Diclofenac Gel 3% and Lidocaine 5% Ointment, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications to the Insureds, particularly given the potential for adverse health effects.

### G.  The Fraudulent Terocin and Lidocaine Patches

194. As a further part of their scheme, the Defendants routinely billed GEICO for exorbitantly priced pain patches in primarily in the form of Terocin 4% Patches and Lidocaine 5% Patches (together, the "Fraudulent Pain Patches"), pursuant to duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers, in exchange for kickbacks or other incentives.

195. In keeping with the fact that the Defendants steered the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Fraudulent Pain Patches were routinely billed

at exorbitant prices despite the fact that there are other, less expensive, commercially available FDA-approved patches.

196.    The Defendants typically billed GEICO – through Satya Drug – between $1,282.00 and $2,253.28 for a single prescription of Terocin 4% Patches, with charges at times exceeding $2,500.00.  Terocin Patches are available OTC without a prescription at a fraction of that price. Additionally, in addition to menthol, the primary ingredient in Terocin Patches is lidocaine which itself is available in an FDA approved patch for a fraction of the cost.

197.    In fact, the Defendants – through Satya Drug – also dispensed and billed for Lidocaine 5% Patches at charges ranging from $224.65 to $1,138.24 for a single prescription of Lidocaine 5% Patches.

198.    Topical pain patches in which the primary ingredient is lidocaine (i.e., the Fraudulent Pain Patches) are mainly used to treat chronic post-herpetic neuropathic pain, although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of the patches themselves.

199.    While the application of pain patches with a primary ingredient of lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

200.    Nevertheless, the Prescribing Providers routinely prescribed the Fraudulent Pain Patches that were dispensed to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

201.    Like the prescriptions for Diclofenac Gel 3% and Lidocaine 5% Ointment, the Prescribing Providers never recommended Insureds first use OTC patches containing lidocaine –

which are available to treat their often acute, minor strain/sprain injuries. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Terocin Patches and Lidocaine Patches to Insureds.

202.    As with the prescriptions for Diclofenac Gel 3% and Lidocaine 5% Ointment, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescription of Fraudulent Pain Patches.

203.    Likewise, the follow-up examination reports virtually never addressed whether the Fraudulent Pain Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

204.    In keeping with the fact that the Defendants acted with gross indifference to patient care and safety, the patients were generally not instructed on the safe use, side effects or risks associated with the Fraudulent Pain Patches.

205.    Moreover, Prescribing Providers prescribed, and the Pharmacy Defendants dispensed, Fraudulent Pain Patches contemporaneously to other Fraudulent Pharmaceuticals.

206.    The Defendants' total billing submitted through Satya Drug to GEICO for Fraudulent Pain Patches exceeds $427,000.00.

### H.    <u>The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Between The Defendants, Prescribing Providers and the Clinic Controllers</u>

207.    To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to the Pharmacies

for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

208.  New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

209.  Here, the Defendants colluded with Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then have those prescriptions directed to the Pharmacies so that the Defendants could bill GEICO huge sums.

210.  The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often being prescribed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were often being prescribed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed as a matter of course without any recommendation that patients first try OTC products; and that the Fraudulent Pharmaceuticals

were prescribed without attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

211.     The Defendants on occasion supplied the Prescribing Providers and the Clinic Controllers with preset labels and stamps to steer the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products that the Pharmacies dispensed to patients of the No-Fault Clinics and direct those prescriptions to the Pharmacies.

212.     The purpose of the Defendants supplying the Prescribing Providers and Clinic Controllers with preset labels and stamps was so that the Prescribing Providers could repeatedly issue predetermined and/or medically unnecessary prescriptions for the exorbitantly priced Fraudulent Topical Pain Products that the Pharmacies "specialized" in dispensing in order to exploit the Insureds' No-Fault Benefits.

213.     The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

214.     The Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and (iv) prescribed and dispensed without any attention to cost and fiscal responsibility, because, among other things, all pharmacists in New York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for contraindications, therapeutic duplication, drug-drug

interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

215.    The Prescribing Providers and the Clinic Controllers would have not engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including using preset labels and stamps distributed by the Defendants, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacies, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

216.    But for the payment of kickbacks, or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Pharmaceuticals, or the volume of the Fraudulent Topical Pain Products, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to the Pharmacies.

217.    The Defendants, Prescribing Providers, and Clinic Controllers have affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

218.    Nevertheless, based on the circumstances surrounding the illegal, collusive arrangements, the Defendants paid, and continue to pay, a financial kickback or provide other financial incentives, and the Prescribing Providers and Clinic Controllers received, and continue to receive, a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that are dispensed by the Pharmacies.

219.    Upon information and belief, the payment of kickbacks was made at or near the time the prescriptions were issued.

## V.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

220.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

221.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

222.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

223.    For each generic drug (or the ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

224.    The Defendants solicited the Prescribing Providers and Clinic Controllers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products so they could bill GEICO and other New York No-Fault insurers for the exorbitantly priced pharmaceuticals products.

225.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive assigned AWP's or "list prices", in order to inflate the billing submitted through the Pharmacies so as to maximize their profits.

226.     The Defendants purported to provide the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, directly to GEICO Insureds, and sought reimbursement directly from GEICO pursuant to executed "Assignment of Benefit" ("AOB") forms.

227.     In support of their charges, the Defendants typically submitted: (i) the Prescribing Providers' prescriptions; (ii) an itemized pharmacy form, which includes the patient's name, the prescribed pharmaceutical, the purported NDC numbers, and corresponding charges for each drug product or ingredient, the prescribing provider, and the date on which the pharmaceutical was prescribed and filled by the pharmacy; and (iii) the AOB assigning the Insureds' benefits to the Defendants.

228.     The NDC numbers listed on the itemized pharmacy forms submitted by the Defendants identify the assigned AWPs for each of the prescription drugs or compounded drug ingredients.

229.     The Defendants never submitted their wholesale purchase invoices demonstrating: (i) how much the Defendants actually paid the supplier for the Fraudulent Pharmaceuticals; and (ii) whether the Defendants actually purchased the Fraudulent Pharmaceuticals with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

230.     In fact, the Defendants never actually paid the targeted and egregious assigned AWP of the Fraudulent Pharmaceuticals that they dispensed, or purported to dispense, because it is not a true representation of the actual market price and is far above the actual acquisition cost for the Fraudulent Pharmaceuticals.

231.     Nevertheless, the Defendants billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of a wide variety of other medications that are FDA-approved and

proven effective.

## VI.   The Defendants' Submission of Fraudulent Billing Forms to GEICO

232.   To support the fraudulent charges, the Defendants submitted to GEICO bills and accompanying documents for No-Fault Benefits by and on behalf of the Pharmacies seeking payment for the pharmaceuticals for which it is ineligible to receive payment.

233.   The bills and other supporting records that the Defendants submitted or caused to be submitted to GEICO, were false and misleading in the following material respects:

> (i)     the bills and other supporting records submitted pursuant to the No-fault laws uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

> (ii)    the bills and other supporting records submitted pursuant to the No-fault laws uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Defendants and Clinic Controllers in order to steer voluminous and illegal prescriptions to the Pharmacies for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

> (iii)   the bills and other supporting records submitted pursuant to the No-fault laws uniformly mispresented to GEICO that the Defendants were in compliance with all material licensing laws, and therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products to dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals;

(iv)    the bills and other supporting records submitted pursuant to the No-fault laws uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal and invalid prescriptions; and

(v)    the bills and other supporting records submitted pursuant to the No-fault laws uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that they engaged in illegal bulk compounding by producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering Satya Drug ineligible to receive reimbursement for No-Fault Benefits.

## VII.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

234.    The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or caused to be submitted to GEICO seeking reimbursement for these products.

235.    To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

236.    Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive, kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to GEICO and other New York insurance

companies.

237.    The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single license, and further billed for multiple drug products, including various oral medications, in order to conceal the scheme to exploit the Insureds for financial gain.

238.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

239.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

240.    In fact, the Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the Pharmacies have ceased active operations, are no longer registered as an active pharmacy with New York State Department of Education, and have been engaged in fraud.

241.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages approximately $627,200.00 representing payments made to GEICO based upon the

fraudulent charges submitted by the Defendants, which damages are to be trebled under 18 U.S.C. § 1962(c), et al. to $1,881,600.00.

242.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

243.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

244.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $1,416,800.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through the Pharmacies.

245.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO because the Pharmacies billed for pharmaceutical products that were medically unnecessary, and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard to genuine patient care.

246.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive agreements in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives.

247.    The Pharmacies have no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products

(i.e., the Fraudulent Topical Pain Products) that the Pharmacies dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

248.   The Pharmacies have no right to receive payment for any pending bills submitted to GEICO because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by the Pharmacies pursuant to illegal, invalid, and duplicitous prescriptions.

249.   The Defendants have no right to receive payment for any pending bills submitted to GEICO through Satya Drug for the Fraudulent Compounded Pain Creams because Satya Drug engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements imposed on drug manufacturers and outsourcing facilities, rendering it ineligible to receive reimbursement for No-Fault Benefits.

250.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Pharmacies have no right to receive payment for any pending bills submitted to GEICO.

**THE SECOND CLAIM FOR RELIEF**
**Against Bassanell and John Doe Nos. "1" through "5"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

251.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

252.   Satya Drug is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

253.    Bassanell and John Doe Nos. "1" through "5" knowingly have conducted and/or participated, directly or indirectly, in the conduct of Satya Drug's  affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or caused to be submitted thousands of fraudulent charges for approximately four years, seeking payments that Satya Drug was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Satya Drug in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; (iv) Satya Drug engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault Benefits; and (v) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Satya Drug to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

254.    Satya Drug's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the

regular way in which Bassanell and John Doe Nos. "1" through "5" operated Satya Drug, inasmuch as Satya Drug was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Satya Drug to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through Satya Drug to the present day.

255. Satya Drug is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Satya Drug in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

256. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $518,474.02 pursuant to the fraudulent bills submitted by the Defendants through Satya Drug.

257. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

### THE THIRD CLAIM FOR RELIEF
**Against Satya Drug, Bassanell and John Doe Nos. "1" through "5"**
**(Common Law Fraud)**

258. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

259.    Satya Drug, Bassanell, and John Doe Nos. "1" through "5" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Satya Drug.

260.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Satya Drug was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Satya Drug in exchange for unlawful kickbacks or other financial incentives; (iii) in every claim, the representation that Satya Drug was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law of New York State regulatory and licensing requirements; (iv) in every claim, the representation that Satya Drug acted in accordance with materials licensing requirements and, therefore, was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-

3.16(a)(12), when in fact Satya Drug engaged in illegal bulk compounding by specializing in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements and (v) in every claim, the representation that Satya Drug was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible to receive reimbursement for No-Fault benefits.

261.    The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Satya Drug that were not compensable under the No-Fault Laws.

262.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $518,474.02 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Satya Drug.

263.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

264.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FOURTH CLAIM FOR RELIEF
### Against Satya Drug, Bassanell and John Doe Nos. "1" through "5"
### (Unjust Enrichment)

265.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

266.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

267.     When GEICO paid the bills and charges submitted by or on behalf of the Satya Drug for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

268.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received and the receipt of kickback payments, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

269.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

270.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $518,474.02.

### THE FIFTH CLAIM FOR RELIEF
**Against Bassanell and John Doe Nos. "1" through "5"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

271.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

272.     RKD Rx is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

273.     Bassanell and John Doe Nos. "1" through "5" knowingly have conducted and/or participated, directly or indirectly, in the conduct of RKD Rx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or caused to be submitted hundreds of

fraudulent charges for approximately thirteen months, seeking payments that RKD Rx was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to RKD Rx in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through RKD Rx to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

274.    RKD Rx's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Bassanell and John Doe Nos. "1" through "5" operated RKD Rx, inasmuch as RKD Rx was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for RKD Rx to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through RKD Rx to the present day.

275.    RKD Rx is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance

system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by RKD Rx in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

276.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $108,735.08 pursuant to the fraudulent bills submitted by the Defendants through RKD Rx.

277.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

**THE SIXTH CLAIM FOR RELIEF**
**Against RKD Rx, Bassanell and John Doe Nos. "1" through "5"**
**(Common Law Fraud)**

278.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

279.    RKD Rx, Bassanell, and John Doe Nos. "1" through "5" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of RKD Rx.

280.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the

representation that RKD Rx was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to RKD Rx in exchange for unlawful kickbacks or other financial incentives; (iii) in every claim, the representation that RKD Rx was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law of New York State regulatory and licensing requirements; and (iv) in every claim, the representation that RKD Rx was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible to receive reimbursement for No-Fault benefits.

281.   The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through RKD Rx that were not compensable under the No-Fault Laws.

282.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $108,735.08 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through RKD Rx.

283.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

284.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THE SEVENTH CLAIM FOR RELIEF**
**Against RKD Rx, Bassanell and John Doe Nos. "1" through "5"**
**(Unjust Enrichment)**

285.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

286.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

287.    When GEICO paid the bills and charges submitted by or on behalf of RKD Rx for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

288.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received and the receipt of kickback payments, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

289.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

290.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $108,735.08.

**THE EIGHTH CLAIM FOR RELIEF**
**Against Bassanell and John Does Nos. "1" through "5"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

291.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

292.    Satya Drug and RKD Rx," constitute an association-in-fact "enterprise" (the "Bassanell Pharmacy Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce.

293.    The members of the Bassanell Pharmacy Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Satya Drug and RKD Rx are ostensibly independent pharmacy entities – with different names, tax identification numbers, and addresses – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent pharmaceutical charges to GEICO and other insurers. The Bassanell Fraud Pharmacy Enterprise has operated under separate corporate names in order to reduce the number of bills submitted under any individual name, avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one pharmacy, and to be able to continue to perpetrate the fraudulent scheme and obtain reimbursement on knowingly fraudulent pharmaceutical billing. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Bassanell Pharmacy Fraud Enterprise acting individually or without the aid of each other.

294.    The Bassanell Pharmacy Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing

overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, by facilitating payments to drivers to deliver pharmaceuticals to the patients, by facilitating  payments for patient referrals, and by retaining collection lawyers whose services were also used to generate payments from insurance companies to support all of the aforesaid functions.

295.    Bassanell and John Does Nos. "1" through "5" were employed by and/or associated with the Bassanell Pharmacy Fraud Enterprise.

296.    Bassanell and John Does Nos. "1" through "5" knowingly conducted and/or participated, directly or indirectly, in the conduct of the Bassanell Pharmacy Fraud  Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for approximately four years seeking payments to which the Defendants were not eligible to receive under the No-Fault Laws because: (i) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive agreements in which they steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to the Pharmacies in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set

of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that Satya Drug and RKD Rx dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; (iv) the Defendants engaged in illegal bulk compounding by having Satya Drug specialize in producing and dispensing large quantities of the Fraudulent Compounded Pain Creams in set formulations, in violation of Federal and New York State regulatory and licensing requirements, rendering it ineligible to receive reimbursement for No-Fault benefits; and (v) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Satya Drug and RKD Rx pursuant to illegal, invalid, and duplicitous prescriptions. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" - "2".

297.    The Bassanell Pharmacy Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Bassanell and John Doe Nos. "1" through "5" operated the Bassanell Pharmacy Fraud Enterprise, inasmuch as the Pharmacies were never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the Bassanell Pharmacy Fraud Enterprise to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through Satya Drug and RKD Rx to the present day.

298.    The Bassanell Pharmacy Fraud Enterprise is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the

New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by the Bassanell Pharmacy Fraud Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

299.    GEICO has been injured in its business and property by reason of the above-described conduct involving the Bassanell Pharmacy Fraud Enterprise in that GEICO has paid approximately $627,200.00 pursuant to the fraudulent bills submitted by the Defendants through Satya Drug and RKD Rx.

300.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

## THE NINTH CLAIM FOR RELIEF
### Against Bassanell and John Does Nos. "1" through "5"
### (Violation of RICO, 18 U.S.C. § 1962(d))

301.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

302.    Bassanell and John Does Nos. "1" through "5" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Bassanell Pharmacy Fraud Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to GEICO.  These acts of mail fraud include, but are not limited to, those that are described in the charts annexed hereto as Exhibits "1" – "2."

303.    Each member of the Bassanell Pharmacy Fraud Enterprise knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $627,200.00 pursuant to the fraudulent bills submitted by the Defendants through Satya Drug and RKD Rx.

304.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

WHEREFORE, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A. On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills, amounting to approximately $1,416,800.00 submitted to GEICO through Satya Drug and RKD Rx;

B. On the Second Claim For Relief against Bassanell, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $518,474.02, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C. On the Third Claim For Relief against Bassanell, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $518,474.02, together with

punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E. On the Fourth Claim For Relief against Satya Drug, Bassanell, and John Do Nos. "1" through "5", a recovery in favor of GEICO in an amount to be determined at trial but approximately $518,474.02, together with punitive damages;

F. On the Fifth Claim for Relief against Bassanell, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $108,735.08, together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G. On the Sixth Claim for Relief against Bassanell, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $108,735.08, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H. On the Seventh Claim for Relief against RKD Rx, Bassanell, and John Do Nos. "1" through "5", a recovery in favor of GEICO in an amount to be determined at trial but approximately $108,735.08, together with punitive damages; and

G. On the Eighth Claim for Relief against all the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $627,200.00, together with treble damages, punitive damages, costs, interest, and such other and further relief as this Court deems just and proper.

H. On the Ninth Claim for Relief against all the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $627,200.00, together

with treble damages, punitive damages, costs, interest, and such other and further relief as this

Court deems just and proper.

Dated:  Uniondale, New York
       November 8, 2021

RIVKIN RADLER LLP

By:   */s/ Michael A. Sirignano*
      Michael A. Sirignano (MS 5263)
      Barry I. Levy (BL 2190)
      Jennifer Abreu (JA 3218)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government*
*Employees Insurance Company, GEICO*
*Indemnity Company GEICO General*
*Insurance Company and GEICO Casualty*
*Company*